UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

HAROLD FORD,

                     Plaintiff,

    -against-

WSP USA INC.,

                     Defendant.

19 Civ. 11705 (LGS)

---

**DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of the United District Court for the Southern District of New York, defendant WSP USA Inc. ("WSP") states that there is no genuine issue to be tried with respect to the following material facts:

**WSP And Its Underground Energy Storage Business**

1.     WSP is a global engineering firm with approximately 500 offices across 40 countries. *See* Declaration of Patricia Brush ¶ 2. As part of the operations of its United States Energy sector, WSP serves oil and natural gas industry clients by designing, and managing the construction or refurbishment of, underground facilities for storage of liquid and gaseous hydrocarbons. *Id*.

2.     With respect to construction and refurbishment activities, WSP serves as a general contractor for these projects, coordinating the activities of a number of subcontractors that perform the work. *Id.*

3.     Most subcontractors utilize their own health, safety, and environmental ("HSE") policies and procedures, and for most projects, to the extent that additional support is needed,

1

WSP provides HSE support to be carried out by site supervisors, in addition to their other site management responsibilities.  *Id.* ¶ 4.  However, for a minority of underground storage projects, WSP engages contractor HSE companies, either because WSP is required to do so by a client or by law, or a particular subcontractor does not fully meet the HSE standards for the project, necessitating full-time HSE oversight by a third party.  *Id.*; *see also* Knopp Decl. ¶ 3, Ex. A ("Brush Dep.") 10:21-11:16, 39:5-9.

### WSP's Engagement Of QPS

4. Quality Project Solutions Inc. ("QPS") provides HSE services.  *See* Brush Dep. 8:16-18.  QPS is duly organized under the laws of the State of Louisiana and "provides project staffing, consulting, recruiting, and technical services to all aspects of the oil and gas, petrochemical, construction, manufacturing, energy, and renewable resource industries."  *See* https://qualityprojectsolutions.com/about; QPS Record from the Louisiana Secretary of State, https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=1315459_93C50D1271.

5. In September 2018, WSP and QPS entered into a Master Service Agreement.  *See* Knopp Decl. ¶ 6, Ex. D ("MSA"); *see also* Brush Dep. 34:23-35:8.  WSP engaged QPS to provide HSE personnel to WSP "as needed."  *See* MSA at WSPFORD_0008823.  The MSA specified that QPS would perform this work "as an independent contractor and not as [WSP's] agent or employee."  *Id.* at 8825.  QPS agreed to "observe and abide by all applicable laws, regulations, ordinances and other rules of Federal, State, and municipal governments and political subdivisions thereof, and of any other duly constituted public authority, having jurisdiction where [QPS's work was] to be performed," and it warranted that its work would be performed "in compliance with all applicable laws, rules and regulations."  *Id.* at 8824.  QPS

2

further agreed to indemnify WSP in the event that WSP incurred losses as a result of QPS's unlawful conduct.  *See id.*

6. WSP retained the right to require that QPS "reassign employees (including those of its subcontractors) if [WSP] determines that any such employee is working in an unsafe manner, in violation of any labor laws, including equal employment opportunity laws or immigration laws, or is not performing the Work according to the terms of [the MSA]." *Id.* at 8826.  However, the MSA did not provide WSP with any authority to hire or fire QPS's employees.  *See generally id.*

7. QPS was free to provide HSE personnel to other customers.  *See generally id.* For example, Ford is aware of a job that QPS had in Houston.  *See* Knopp Decl. ¶ 5, Ex. C ("Ford Dep.") 73:12-74:1.  QPS was also free to reassign Ford at its discretion, so long as it could replace him with a qualified substitute.  *See* Brush Decl. ¶ 9.

### QPS's Engagement Of Ford And Ford's Services To WSP

8. Ford is a highly trained and experienced HSE professional.  *See* Ford Dep. 42:17-46:3; Knopp Decl. ¶ 10, Ex. H (Ford's résumé) at WSPFORD_0008802 (describing himself as an "HSE Professional with a Passion for Safety!").  He has worked as an HSE professional since 1998 for more than a dozen companies, usually as an independent contractor.  *See* Knopp Decl. ¶ 10, Ex. H; Ford Dep. 15:11-13.

9. QPS hired Ford in March 2019.  Ford Dep. 51:9-12.

10. After WSP approved Ford to work on WSP projects, Robley Dugas, QPS's Chief Executive Officer and President, assigned Ford to work on WSP projects for Atmos Energy Corporation, a natural gas distributor.  *See* Knopp Decl. ¶ 8, Ex. F (March 6, 2019 email from Dugas to Perry Dobbs and Brush forwarding Ford's résumé "for approval" and stating that

Dugas was submitting the résumé for a project in Virginia "but may send [Ford] to Atmos . . . ."); Brush Decl. ¶ 10; *see also* Ford Dep. 31:19-32:17 (describing the projects he worked on for Atmos).

11. QPS trained Ford at QPS's expense. *See* Ford Dep. 51:17-25, 58:17-62:14 (describing training by QPS co-owner Kourtney Moody and class taken in preparation for work on Atmos projects); Knopp Decl. ¶ 8, Ex. F (email containing statement by Dugas that he would be sending Ford to train with Moody "at my expense"); Brush Dep. 57:25-58:8.

12. Ford coordinated with a site supervisor and other HSE professionals to help to ensure that the subcontractors on site for the Atmos Energy projects complied with applicable U.S. Occupational Safety and Health Administration regulations and the health, safety, and environmental policies contained in the project's Project Safety Plan. *See* Brush Dep. 16:4-17:22; Knopp Decl. ¶ 4, Ex. B ("Dobbs Dep.") 34:19-35:12; Ford Dep. 101:24-103:3.

13. During Ford's two months of work with WSP, he worked only at worksites on property owned or leased by Atmos. *See* Ford Dep. 32:14-33:17, 75:23-76:1, 88:16-18. He has never been to a WSP office. *Id.* at 33:25-34:1.

14. WSP rented gas monitors from QPS that were kept on site. *See* Brush Dep. 45:20-46:10. QPS provided the computer that Ford used. *Id.* at 46:20-22. HSE professionals are responsible for providing their own personal protective equipment like a hard hat and safety glasses, gloves, and boots. S*ee id.* at 45:20-46:10; Dobbs Dep. 26:25-27:5. Ford testified in his deposition that he wore a hard hat and safety boots on site. *See* Ford Dep. 120:7-8. He stated that he supplied his own boots, but that he was not sure if WSP gave him a hard hat. *Id.* at 120:9-16.

15. QPS determined Ford's schedule. *See* Dobbs Decl. ¶ 2, Ex. A (March 19, 2019 email from Dugas to WSP employees Jason Landry and Dobbs attaching Ford's schedule and showing that QPS scheduled Ford to work the day shift between March 18, 2019 and March 31, 2019); Brush Decl. ¶ 10, Ex. A (April 17, 2019 email from Dugas to Brush, Dobbs, and project manager Joshua Noeldner updating them on scheduling changes he had made after firing an HSE professional working on the same project as Ford). Ford does not know who determined his schedule. *See* Ford Dep. 97:20-98:4.

16. QPS had other customers, and WSP did not prohibit Ford from working for other QPS customers on days off from WSP projects. *See id.* at 73:12-74:1; Brush Decl. ¶ 9. QPS also had the authority to remove Ford from the Atmos Energy projects and assign him to other jobs, so long as QPS could replace him with a qualified HSE professional. Brush Decl. ¶ 9.

17. Ford emailed reports or "field notes" to QPS and WSP at the end of the day. *See* Ford Dep. 114:18-20; Dobbs Dep. 22:2-4; *see also* Knopp. Decl. ¶ 11, Ex. I (example of a daily report by Ford). The purpose of the reports was to identify "any at-risk observations or safe observations and then document the safety topics or issues that have been encountered on the project – and corrections made." *See* Brush Dep. 40:22-41:5. He also attended safety meetings and generally monitored the worksite for safety compliance. *See* Ford Dep. 101:24-103:3.

18. Ford is not aware of anyone at WSP formally evaluating his work performance, did not interact with any WSP personnel on a typical shift other than the site supervisor (who was on the opposite side of the work site so that they each could observe the subcontractors' work from different angles), and, other than emailing reports at the end of the day, interacted with WSP "occasionally by phone" and during a "couple" visits by HSE field specialist Jason Landry. *See* Ford Dep. 115:2-4, 116:9-20, 117:11-118:11.

19. QPS billed WSP a flat rate of $600 for each day that Ford worked. *See* Knopp Decl. ¶ 7, Ex. E (invoice from QPS to WSP); Brush Dep. 51:14-52:2.

20. QPS paid Ford a fixed amount for each day worked. *See* Ford Dep. 81:14-20; Knopp Decl. ¶ 7, Ex. E. QPS initially paid him $400 per day worked and later raised his pay to $420 per day because he was doing a "great job." *See* Ford Dep. 74:24-75:22.

21. Neither Patricia Brush (WSP's Health, Safety, and Environmental Vice President for its U.S. Energy Market sector) nor Perry Dobbs (a WSP HSE field services manager) had knowledge of QPS's pay practices until after this lawsuit was filed, when Dugas sent WSP an email in which he defended QPS's pay of Ford as "automatic overtime" compliant with the FLSA and contended that Ford "is not owed anything." *See* Brush Dep. 59:7-17; Knopp Decl. ¶ 9, Ex. G; Dobbs Dep. 39:14-40:2.

22. Ford did not complain about his classification as a contractor by QPS before filing this lawsuit. *See* Ford Dep. 70:14-17. Nor did he complain to WSP about his pay before filing this lawsuit. *See* Brush Decl. ¶ 7; Dobbs Decl. ¶ 3.

23. WSP is not aware of any other complaints or claims by an HSE professional alleging that WSP jointly employed him or her or failed to pay overtime as required by the FLSA. *See* Brush Decl. ¶ 8. No court, governmental agency, or other authority has found WSP to be a joint employer of HSE professionals. *See id.*

24. QPS was responsible for maintaining all records of hours worked by, and amounts paid to, Ford. Brush Decl. ¶ 7.

**QPS's Firing Of Ford**

25. In May 2019, QPS fired Ford following a dispute about mileage reimbursement. *See* Ford Dep. 75:23-77:15. Dugas made the decision to terminate Ford's employment. *See id.*;

Knopp Decl. ¶ 9, Ex. G.  WSP was not involved in that decision.  *See* Dobbs Dep. 11:11-21;

Dobbs Decl. ¶ 4, Ex. B (June 17, 2019 email from Dugas to Dobbs reporting that he fired Ford).

Dated: March 26, 2021                              Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

s/ *Gregory W. Knopp*
Gregory W. Knopp
New York Bar No. 2892909
1999 Avenue of the Stars, Suite 600
Los Angeles, CA 90067
Telephone:     310.229.1000
Facsimile:      310.229.1001
gknopp@akingump.com

Nathan J. Oleson (*pro hac vice*)
Joshua K. Sekoski (*pro hac vice*)
Zara H. Shore (*pro hac vice*)
2006 K Street, NW
Washington, DC 20006
Telephone:     202.887.4000
Facsimile:      202.887.4288
noleson@akingump.com
jsekoski@akingump.com
zshore@akingump.com

*Counsel for Defendant WSP USA Inc.*