**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| HAROLD FORD, Individually and for Others Similarly Situated, <br><br> v. <br><br> WSP USA, INC. | Case No. 1:19-cv-11705-LGS <br><br> Jury Trial Demanded |

**FORD'S RULE 56.1 STATEMENT**

Pursuant to Rule 56.1 of the Local Rules for the Southern District of New York, WSP submitted a

Statement of Material Fact in support of its Partial Motion for Summary Judgment. Doc. 79. Below

in bold are Ford's responses to each paragraph offered by WSP, as well as Ford's statement of

additional material facts as to which it is contended that there exists a genuine issue to be tried:

**A.      FORD'S RESPONSES TO WSP'S RULE 56.1 STATEMENTS:**

1. WSP is a global engineering firm with approximately 500 offices across 40 countries. *See* Declaration of Patricia Brush ¶ 2. As part of the operations of its United States Energy sector, WSP serves oil and natural gas industry clients by designing, and managing the construction or refurbishment of, underground facilities for storage of liquid and gaseous hydrocarbons. *Id.*

**Ford does not dispute this Statement.**

2. With respect to construction and refurbishment activities, WSP serves as a general contractor for these projects, coordinating the activities of a number of subcontractors that perform the work. *Id.*

**Ford disputes this Statement to the extent, WSP calls itself a "general contractor." WSP asserted control over Ford's job. This included a preparing and implementing a detailed Project Safety Plan (PSP) which Ford and the other HSE workers had to adhere to. Ford Decl. ¶ 16. Ford also had to use forms and procedures provided by WSP. *Id.* WSP also controlled the hours worked and how Ford's rate of pay would be calculated. *Id.* ¶ 6.**

3. Most subcontractors utilize their own health, safety, and environmental ("HSE") policies and procedures, and for most projects, to the extent that additional support is needed, WSP provides HSE support to be carried out by site supervisors, in addition to their other site management responsibilities. *Id.* ¶ 4. However, for a minority of underground storage projects, WSP engages contractor HSE companies, either because WSP is required to do so by a client or by law, or a particular subcontractor does not fully meet the HSE standards for the project, necessitating full-time

HSE oversight by a third party. *Id.*; *see also* Knopp Decl. ¶ 3, Ex. A ("Brush Dep.") 10:21-11:16, 39:5-9.

**Ford disputes this Statement to the extent portions of it cannot be verified. Ford does not know if WSP provides HSE workers to a "minority" of its underground storage projects. Ford disputes this statement with regards to term "oversight by a third party" because he was directed and controlled by WSP. Ford Decl. ¶¶ 6, 16.**

4. Quality Project Solutions Inc. ("QPS") provides HSE services. *See* Brush Dep. 8:16-18. QPS is duly organized under the laws of the State of Louisiana and "provides project staffing, consulting, recruiting, and technical services to all aspects of the oil and gas, petrochemical, construction, manufacturing, energy, and renewable resource industries." *See* https://qualityprojectsolutions.com/about; QPS Record from the Louisiana Secretary of State, https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=1315459_93C50D1271.

**Ford does not dispute this Statement.**

5. In September 2018, WSP and QPS entered into a Master Service Agreement. *See* Knopp Decl. ¶ 6, Ex. D ("MSA"); *see also* Brush Dep. 34:23-35:8. WSP engaged QPS to provide HSE personnel to WSP "as needed." *See* MSA at WSPFORD_0008823. The MSA specified that QPS would perform this work "as an independent contractor and not as [WSP's] agent or employee." *Id.* at 8825. QPS agreed to "observe and abide by all applicable laws, regulations, ordinances and other rules of Federal, State, and municipal governments and political subdivisions thereof, and of any other duly constituted public authority, having jurisdiction where [QPS's work was] to be performed," and it warranted that its work would be performed "in compliance with all applicable laws, rules and regulations." *Id.* at 8824. QPS further agreed to indemnify WSP in the event that WSP incurred losses as a result of QPS's unlawful conduct. *See id.*

**Ford does not dispute this Statement.**

6. WSP retained the right to require that QPS "reassign employees (including those of its subcontractors) if [WSP] determines that any such employee is working in an unsafe manner, in violation of any labor laws, including equal employment opportunity laws or immigration laws, or is not performing the Work according to the terms of [the MSA]." *Id.* at 8826. However, the MSA did not provide WSP with any authority to hire or fire QPS's employees. *See generally id.*

**Ford does not dispute the MSA allows WSP may require QPS to remove employees. He maintains WSP exercised discretion over his placement on the project.**

7. QPS was free to provide HSE personnel to other customers. *See generally id* .For example, Ford is aware of a job that QPS had in Houston. *See* Knopp Decl. ¶ 5, Ex. C ("Ford Dep.") 73:12-74:1. QPS was also free to reassign Ford at its discretion, so long as it could replace him with a qualified substitute. *See* Brush Decl. ¶ 9.

**Ford disputes this Statement. His testimony reflects he believed QPS provided people to another project at some point, Ford Dep. at 73:12-74:1, and Brush's declaration states only**

that Ford could be assigned to other projects. *See* Brush Decl. ¶ 9. It does not reflect QPS could assign Ford to projects for other customers. *Id.*

8. Ford is a highly trained and experienced HSE professional. *See* Ford Dep. 42:17- 46:3; Knopp Decl. ¶ 10, Ex. H (Ford's résumé) at WSPFORD_0008802 (describing himself as an "HSE Professional with a Passion for Safety!"). He has worked as an HSE professional since 1998 for more than a dozen companies, usually as an independent contractor. *See* Knopp Decl. ¶10, Ex. H; Ford Dep. 15:11-13.

**Ford does not dispute his experience or history, but does dispute he was "usually an independent contractor." His resume reflects only he was frequently characterized as an independent contractor and paid through a 1099. Whether he would be considered an independent contractor by a court is unknown.**

9. QPS hired Ford in March 2019. Ford Dep. 51:9-12.

**Ford does not dispute he was hired through QPS in March 2019.**

10. After WSP approved Ford to work on WSP projects, Robley Dugas, QPS's Chief Executive Officer and President, assigned Ford to work on WSP projects for Atmos Energy Corporation, a natural gas distributor. *See* Knopp Decl. ¶ 8, Ex. F (March 6, 2019 email from Dugas to Perry Dobbs and Brush forwarding Ford's résumé "for approval" and stating that Dugas was submitting the résumé for a project in Virginia "but may send [Ford] to Atmos . . . ."); Brush Decl. ¶ 10; *see also* Ford Dep. 31:19-32:17 (describing the projects he worked on for Atmos).

**Ford does not dispute that QPS forwarded his resume to WSP. He also had a phone interview with Perry Dobbs. Ford Dep. at 89:20-90:24.**

11. QPS trained Ford at QPS's expense. *See* Ford Dep. 51:17-25, 58:17-62:14 (describing training by QPS co-owner Kourtney Moody and class taken in preparation for work on Atmos projects); Knopp Decl. ¶ 8, Ex. F (email containing statement by Dugas that he would be sending Ford to train with Moody "at my expense"); Brush Decl. 57:25-58:8.

**Ford disputes this Statement. His testimony reflects that Ms. Moon gave him paperwork from WSP and he attended at class the day he met her, but does not remember if the instructor was from QPS or WSP. Ford Dep. at 58:17-62:14. He also testified he has done training on his own and with his employers. Ford Dep. at 49:25-50:4**

12. Ford coordinated with a site supervisor and other HSE professionals to help to ensure that the subcontractors on site for the Atmos Energy projects complied with applicable U.S. Occupational Safety and Health Administration regulations and the health, safety, and environmental policies contained in the project's Project Safety Plan. *See* Brush Dep. 16:4- 17:22; Knopp Decl. ¶ 4, Ex. B ("Dobbs Dep.") 34:19-35:12; Ford Dep. 101:24-103:3.

**Ford was required to implement the project safety plan created, implemented, by WSP, in addition to any OSHA requirements. Ford Dep. at 93:20-94:10; 108:11-109:6; Brush Dep. at 16:4-18:1. Ford recalls reporting to WSP and not its subcontractors.**

13. During Ford's two months of work with WSP, he worked only at worksites on property owned or leased by Atmos. *See* Ford Dep. 32:14-33:17, 75:23-76:1, 88:16-18. He has never been to a WSP office. *Id.* at 33:25-34:1.

**Ford worked for WSP for over two months.**

14. WSP rented gas monitors from QPS that were kept on site. *See* Brush Dep .45:20-46:10. QPS provided the computer that Ford used. *Id.* at 46:20-22. HSE professionals are responsible for providing their own personal protective equipment like a hard hat and safety glasses, gloves, and boots. S*ee id.* at 45:20-46:10; Dobbs Dep. 26:25-27:5. Ford testified in his deposition that he wore a hard hat and safety boots on site. *See* Ford Dep. 120:7-8. He stated that he supplied his own boots, but that he was not sure if WSP gave him a hard hat. *Id.* at 120:9-16.

**Brush testified that QPS "probably" supplied personal gas monitors. Brush Dep. at 46:23-10. She also testified WSP provided the trailer and desk the HSE personnel used. *Id.* at 46:11-25. Ford testified WSP provided his living quarters, office supplies and cleaning supplies. Ford Dep. at 86:4-25; 119:19-120:23. He also stated the gas monitor and hard hat came from WSP, but he provided his own boots. *Id.***

15. QPS determined Ford's schedule. *See* Dobbs Decl. ¶ 2, Ex. A (March 19, 2019 email from Dugas to WSP employees Jason Landry and Dobbs attaching Ford's schedule and showing that QPS scheduled Ford to work the day shift between March 18, 2019 and March 31, 2019); Brush Decl. ¶ 10, Ex. A (April 17, 2019 email from Dugas to Brush, Dobbs, and project manager Joshua Noeldner updating them on scheduling changes he had made after firing an HSE professional working on the same project as Ford). Ford does not know who determined his schedule. *See* Ford Dep. 97:20-98:4.

**Ford disputes this statement. He testified he believed Dobbs and WSP determined his schedule, not QPS, but that he had not seen that in writing. Ford Dep. 97:24-98:23; Ford Decl. ¶ 6. The scheduling email from QPS does not reflect QPS created the schedule nor indicate it alone determined who would be working or the hours. *See* Dobbs Decl. ¶ 2, Ex. A. Additionally, the email on scheduling updates does not reflect that QPS terminated Dan Pillet, only that he was removed from WSP's site. Brush Decl. Ex. A. Ford's testimony reflects WSP "ran [Dan] off location" not QPS. Ford. Dep. at 100:3-15.**

16. QPS had other customers, and WSP did not prohibit Ford from working for other QPS customers on days off from WSP projects. *See id.* at 73:12-74:1; Brush Decl. ¶ 9. QPS also had the authority to remove Ford from the Atmos Energy projects and assign him to other jobs, so long as QPS could replace him with a qualified HSE professional. Brush Decl. ¶ 9.

**Ford disputes this statement. His testimony reflects he believes QPS may have had another project in Houston not with WSP, but does not reflect when this happened, nor indicate he could be assigned to that project. Brush's testimony that Ford could work for other QPS clients on his "days off from a WSP project" is meaningless, given that Ford worked 12-14 hour shifts for WSP on a 14-7 hitch**.

17. Ford emailed reports or "field notes" to QPS and WSP at the end of the day. *See* Ford Dep. 114:18-20; Dobbs Dep. 22:2-4; *see also* Knopp. Decl. ¶ 11, Ex. I (example of a daily report by Ford). The purpose of the reports was to identify "any at-risk observations or safe observations and then

document the safety topics or issues that have been encountered on the project – and corrections made." *See* Brush Dep. 40:22-41:5. He also attended safety meeting sand generally monitored the worksite for safety compliance. *See* Ford Dep. 101:24-103:3.

**Ford does not dispute this Statement but maintains this was not the extent of his responsibilities. He was required to use WSP forms for his reports. He also maintains that WSP required this work of him.**

18. Ford is not aware of anyone at WSP formally evaluating his work performance, did not interact with any WSP personnel on a typical shift other than the site supervisor (who was on the opposite side of the work site so that they each could observe the subcontractors' work from different angles), and, other than emailing reports at the end of the day, interacted with WSP "occasionally by phone" and during a "couple" visits by HSE field specialist Jason Landry. *See* Ford Dep. 115:2-4, 116:9-20, 117:11-118:11.

**Ford is not aware of a formal evaluation but testified he was subject to discipline by WSP personnel. Ford Dep. at 100:20-101:9. He also testified he worked with all WSP employees and personnel of various contractors on site. *Id.* at 103:4-19.**

19. QPS billed WSP a flat rate of $600 for each day that Ford worked. *See* Knopp Decl. ¶ 7, Ex. E (invoice from QPS to WSP); Brush Dep. 51:14-52:2.

**Ford does not dispute WSP paid QPS a flat rate of $600.**

20. QPS paid Ford a fixed amount for each day worked. *See* Ford Dep. 81:14-20; Knopp Decl. ¶ 7, Ex. E. QPS initially paid him $400 per day worked and later raised his pay to $420 per day because he was doing a "great job." *See* Ford Dep. 74:24-75:22.

**QPS provided payroll but Ford was paid by WSP, who approved his time and invoices. Ford Dep. at 94:25-96:3; Ford Decl. ¶ 6.**

21. Neither Patricia Brush (WSP's Health, Safety, and Environmental Vice President for its U.S. Energy Market sector) nor Perry Dobbs (a WSP HSE field services manager) had knowledge of QPS's pay practices until after this lawsuit was filed, when Dugas sent WSP an email in which he defended QPS's pay of Ford as "automatic overtime" compliant with the FLSA and contended that Ford "is not owed anything." *See* Brush Dep. 59:7-17; Knopp Decl. ¶ 9, Ex. G; Dobbs Dep. 39:14-40:2.

**Ford disputes this Statement. Dobbs testified he was aware that Ford and others were paid a day rate. Dobbs Dep. at 16:13-25.**

22. Ford did not complain about his classification as a contractor by QPS before filing this lawsuit. *See* Ford Dep. 70:14-17. Nor did he complain to WSP about his pay before filing this lawsuit. *See* Brush Decl. ¶ 7; Dobbs Decl. ¶ 3.

**Ford does not dispute this Statement.**

23. WSP is not aware of any other complaints or claims by an HSE professional alleging that WSP jointly employed him or her or failed to pay overtime as required by the FLSA. *See* Brush Decl. ¶ 8.

No court, governmental agency, or other authority has found WSP to be a joint employer of HSE professionals. *See id.*

**WSP does not deny it has knowledge of overtime payments required by the FLSA nor that it, or one of its affiliates, recently agreed to pay nearly $2.8 million in back wages due to a DOL investigation.**

24. QPS was responsible for maintaining all records of hours worked by, and amounts paid to, Ford. Brush Decl. ¶ 7.

**Ford disputes this Statement. He was required to get his time sheets approved by WSP's company man on site, who kept a copy for his records. Ford Dep. at 94:25-96:3. Ford also testified WSP maintained a personnel file on him.** *Id.*

25. In May 2019, QPS fired Ford following a dispute about mileage reimbursement. *See* Ford Dep. 75:23-77:15. Dugas made the decision to terminate Ford's employment. *See id.*; Knopp Decl. ¶ 9, Ex. G. WSP was not involved in that decision. *See* Dobbs Dep. 11:11-21; Dobbs Decl. ¶ 4, Ex. B (June 17, 2019 email from Dugas to Dobbs reporting that he fired Ford).

**Ford was told he was terminated because he failed to attach a map to his mileage reimbursement request. Ford Dep. 80:8-19. He disputes WSP was not involved in that decision.**

**B.   FORD'S RULE 56.1 STATEMENTS:**

1. **A genuine issue of material fact exists as to whether WSP knowingly, willfully, or in reckless disregard carried out this illegal pattern or practice of failing to pay Ford and the Day Rate Workers like him overtime compensation. WSP knew Ford was paid a day rate by QPS and knew he regularly worked 12-14 hour shifts, 7 days a week. Ford Dep. at 94:25-95:23; Dobbs Dep. at 16:10-25; Doc. 78-2; Doc. 82-3.**

2. **A genuine issue of material fact exists as whether WSP is a joint employer of Ford and the Day Rate Workers:**

   - **Ford testified he interviewed with Perry Dobbs of WSP before he was hired. Ford Dep. at 89:20-90:24.**

   - **He also testified WSP could discipline him and have him remove him from the worksite.** *Id.* **at 100:22-101:23; 115:5-20.**

   - **WSP also controlled Ford's schedule. Ford testified it was WSP who set his schedule, and required him to work 12-14 hour shifts, and set his work schedule as 14 days on, 7 days off. Ford Decl. at ¶¶ 13,14; Ford. Dep. at 97:20-98:23.**

   - **Ford had to get approval from WSP to alter his shift. Ford. Dep. at 91:12-93:4.**

6

- **WSP controlled the conditions of Ford's work. WSP provided the project safety plan he had to follow and implement. Brush Dep. at 16:4-17:3; Dobbs Dep. at 24:8-20.**

- **WSP mandated Ford follow WSP's policies.  Brush Dep.** at 35:24-36:3

- **WSP required him to provide certain reports and use WSP forms. Brush Dep. at 39:19-40:25; 41:8-18; 53:9-18; 54:6-25; Dobbs Dep at 20:9-19, 22:2-11; 25:20-25; Ford. Dep. at 70:22-73:7**

- **WSP regulated what he would wear. Ford Dep. at 93:20-25**

- **WSP provided him with equipment, including lodging, an office, and safety equipment.** *Id.* **at 86:4-87:23; 119:19-120:23.**

- **If he didn't follow WSP's policies, he could be taken off WSP's projects. Brush Dep. at 36:4-37:20.**

- **WSP controlled Ford's pay and how his pay was calculated. Ford Dep. at 94:25-95:23; Ford. Decl. at ¶ 6.**

- **It paid QPS a day rate for Ford's time and required Ford to submit his invoices to WSP showing his day rate pay.** *Id.*

- **WSP maintained employment records on Ford. Not only did it keep copies of his invoices and schedule, Id.; Brush Dep at 12:21-13:7.**

- **WSP had a personnel file on him. Ford Dep. at  94:11-24**.

3. **A genuine issue of material fact exists as to whether WSP may be held jointly liable with those companies it used to staff HSE workers, such as QPS. WSP has not moved for summary judgment on these grounds but seeks to evade this liability in its requested relief.**

Dated:  New York, New York
          April 16, 2021

Respectfully submitted,

/s/ Michael A. Josephson
**Michael A. Josephson**
Texas State Bar No. 24014780
**Andrew Dunlap**
Texas State Bar No. 24078444
**Richard M. Schreiber**
Texas State Bar No. 24056278
**JOSEPHSON DUNLAP, LLP**
11 Greenway Plaza, Suite 3050
Houston, Texas 77046
713-352-1100 – Telephone
713-352-3300 – Facsimile
mjosephson@mybackwages.com
adunlap@mybackwages.com
rschreiber@mybackwages.com

**Richard J. (Rex) Burch**
Texas State Bar No. 24001807
**BRUCKNER BURCH PLLC**
11 Greenway Plaza, Suite 3025
Houston, Texas 77046
713-877-8788 – Telephone
713-877-8065 – Facsimile
rburch@brucknerburch.com

Dana M. Cimera
**FITAPELLI & SCHAFFER, LLP**
Joseph A. Fitapelli
Dana M. Cimera
28 Liberty Street, 30th Floor
New York, NY 10005
Telephone: (212) 300-0375

**ATTORNEYS IN CHARGE FOR PLAINTIFF**

CERTIFICATE OF SERVICE

I served this through ECF on April 16, 2021.

/s/ Michael A. Josephson
Michael A. Josephson